UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

BIO ENTERPRISES, INC. and KAY CASPERSON,

               Plaintiffs,

      v.

IDEAL HEALTH, INC.,

              Defendant.

------------------------------------------------------------------x

07 Civ. 7049 (VM)

**COMPLAINT**

**ECF Case**

(Jury Trial Demanded)

      Plaintiffs Bio Enterprises, Inc. ("Bio Enterprises") and Kay Casperson (sometimes referred to herein as "Plaintiffs"), by their attorneys, the Law Offices of Carole R. Bernstein, as and for their complaint, respectfully allege:

## PARTIES and JURISDICTION

1.     Plaintiff Bio Enterprises is, and at all relevant times hereinafter mentioned, was a Florida corporation, with its principal place of business in Sanibel, Florida. Bio Enterprises is a citizen of the State of Florida.

2.     Kay Casperson is, and at all relevant times hereinafter mentioned, was an individual residing in the State of Florida. Ms. Casperson is the founder and president of Bio Enterprises. Ms. Casperson is a citizen of the State of Florida.

3.     Upon information and belief, at all relevant times hereinafter mentioned, Defendant Ideal Health, Inc. ("Ideal Health") is a corporation organized under the laws of the

State of Nevada, having its principal place of business in Byfield, Massachusetts. Ideal Health is a citizen of the State of Nevada and the Commonwealth of Massachusetts.

4.    Because this controversy is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs, the Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. 1332(a).

5.    Venue is appropriate in the United States District Court for the Southern District of New York because the occurrences in the Complaint took place across the United States and the parties have agreed to venue in the Southern District of New York in the contract at issue in the case.

### Factual Background

6.    Bio Enterprises is a company that manufactures and markets high end personal care spa products under the trade name BIO Essentials. Bio Essentials is an all natural skin care line that was originally created for the spa and salon industries. Bio Essentials has been featured in many women's lifestyle and skin care publications, including Women's Health and Fitness, Energy, Modern Salon, Upscale and Skin, Inc. The Bio Essentials line also received numerous industry awards, including the prestigious Addy Awards. In addition, Bio Essentials products were presented to all presenters and performers at the Grammy Awards both in Miami and Los Angeles.

7.    Ms. Kay Casperson, Bio Enterprises' President, founded the company in 1995. Ms. Casperson has worked for over two decades in many aspect of the beauty industry, from consulting, teaching and training to researching and developing beauty products. Ms. Casperson,

-2-

through research, dedication and commitment, gave the Bio Enterprises brand a well-respected brand in the industry.

8.    Upon information and belief, Ideal Health is a company that markets nutritional supplements though a network of distributors.

9.    Upon information and belief, sometime in or around December 2003, Ideal Health sought to expand into the personal care industry and approached Ms. Casperson about acquiring Bio Essentials. In connection therewith, Ideal Health made certain promises and representations to Ms. Casperson in order to induce her to sell to Ideal Health the assets of Bio Enterprises, including the Bio Essentials line of products.

**Ideal Health Steals Bio Essentials From Bio Enterprises and Ms. Casperson**

10.    By way of example, Todd Stanwood, the then President of Ideal Health, told Ms. Casperson that selling and promoting the Bio Essentials products though Spa Parties, Previews and events would lead to an enormous amount of new customers based on the explicit representation that there were already "thousands of sales people" at Ideal Health ready to take Bio Essentials on board. However, after Ideal Health acquired Bio Essentials (as discussed, in detail, *infra*), this form of selling was launched and abruptly sabotaged by Ideal Health's decision to focus only on recruiting and coercing people to buy beauty product packages that Ideal Health had no intention of moving, other than to form a duplication process by which to recruit more people.

11.    Concerned that Ms. Casperson would not agree to turn over her interest in Bio Essentials to Ideal Health, Mr. Stanwood conspired with a shareholder of Ideal Health, Lyn Burke, to have Ms. Burke sign over her entire equity interest in Ideal Health to Ms. Casperson in an attempt to get Ms. Casperson to agree to sell Bio Essentials to Ideal Health. This was

-3-

apparently a fraudulent transfer, as Ms. Casperson later learned, after signing the Acquisition Agreement (as hereinafter defined), that the Ideal Health shareholders did not consent to such transfer.

**The Acquisition Agreement**

12.    In reliance upon the representations as aforesaid and promises of a complete support of Bio Essentials, Ideal Health and Bio Enterprises entered into an agreement dated May 19, 2004 (the "Acquisition Agreement") whereby Ideal Health acquired the Bio Essentials line of products and trademark.

13.    Pursuant to the terms of the Acquisition Agreement, the parties agreed that the Acquisition Agreement "shall be governed by and construed in accordance with the laws of the state of New York and applicable federal law [and that] the appropriate state or federal courts located in New York, New York, shall have exclusive jurisdiction over all matters arising under this ... Agreement and shall be the proper forums to adjudicated such matters." A copy of the Acquisition Agreement is annexed hereto as Ex. A.

14.    Pursuant to the terms of the Agreement, Bio Enterprises agreed to sell, convey, transfer and deliver to Ideal Health all of its right, title and interest in (i) the trademark "Bio Essentials" including all similar marks thereto and the goodwill related thereto; (ii) any patents on cosmetic lotions; (iii) all footage of events relating to Bio Essentials cosmetics lotions which have been filmed, including pictures and images, sounds, scripts; and (iv) any and all related intangible property rights of Bio Essentials relating to its business. Bio Enterprises also agreed to transfer the Bio Essentials trademark including all rights to U.S. Registration No. 2673599 and U.S. Registration No. 2721490.

15.     In exchange for the sale of the assets of Bio Essentials to Ideal Health, Ideal Health agreed to compensate Ms. Casperson as follows:

a.      A minimum guaranteed payment of $5,000.00 per month commencing on July 1, 2004;

b.      In the event that the sum of the monthly sales royalty, the monthly membership fee royal and the monthly sales aids royalty as set forth in the agreement amounts to less than $5,000 in any calendar month, Ideal Health was to pay Ms. Casperson an amount which when combined with the monthly sales royalty, the monthly membership fee royalty and the monthly sales and royalty equals $5,000.00.

c.      Ms. Casperson was to receive a sales royalty equal to 2% of the total wholesale gross sales of all Bio and Bio Essentials personal care products less any sales, excise, use or any other taxes (not including income or franchises taxes) payable with respect to such sales, as well as return, chargeback, bad debt and any fees and/or costs related to returns, chargeback, and any billing or other disputes; and

d.      Ms. Casperson was to receive a royalty of 4% of the Bio Essentials Membership Fees collected per month less any sales, excise, use or any other taxes (not including income or franchise taxes) payable with respect to such sales, as well as returns, chargebacks, bad debt and any fees and/or

-5-

costs related to return chargebacks, and any billing or other disputes;

e.    All net profits resulting from the sale of all Bio Essentials Sales Training Aids, including but not limited to, audio or video programs, DVD's, CD's and books, were to be equally divided on a 50/50 basis per month between Ms. Casperson and UIX, LLC; and

f.    Ideal Health was to pay for Ms. Casperson's reasonable business expenses including air, ground transportation, telephone, food and lodging.

16.    In addition, pursuant to a written amendment dated May 19, 2004, Ideal Health agreed to pay for Ms. Casperson's family insurance policy commencing no later than June 19, 2004.

17.    Ms. Casperson and Bio Enterprises performed their obligations under the Agreement.

18.    Not long after Plaintiffs signed the Acquisition Agreement, it became apparent to Plaintiffs that Ideal Health had no intention of honoring the Acquisition Agreement. For instance, despite Ideal Health's representation to Ms. Casperson that it would be doing television infomercials, marketing materials, providing adequate support staff, including "thousands of representatives," and providing to Ms. Casperson decision making power over the Bio Essentials products that took years and years of hard work and substantial investment of her own capital to create, Ideal Health embarked on a campaign to decimate the Bio Essentials brand and

-6-

philosophy by, among other things, focusing entirely on recruiting and inventory loading with a compensation plan that only rewarded people who continue to recruit along with inventory loading. The compensation plan associated with the foregoing serves to reward an individual who continues to recruit with no intention of gathering customers.

19.     Furthermore, Ideal Health violated the Acquisition Agreement by (i) manufacturing certain Bio Essentials packaging without Ms. Casperson's input or approval; (ii) designing a website and catalog featuring the Bio Essentials line of products without obtaining Ms. Casperson's approval; and (iii) manufacturing certain body and hair care products, also without Ms. Casperson' approval.

20.     Finally, commencing in or around October 2004, Ideal Health caused the Agreement to be breached by, among other things, failing to make such payments to Ms. Casperson as it agreed in the Agreement.

21.     Ideal Health failed to pay plaintiffs royalties for March 2006 through the present (at $5,000.00 guaranteed per month), all in the sum of $80,000.00.

22.     Ideal Health failed to pay Plaintiffs the sum of at least $55,906.28 representing certain expenses to be paid by Ideal Health pursuant to the Acquisition Agreement for the period commencing October 2004 through the present.

23.     Furthermore, Ideal Health has failed to pay to Plaintiffs (i) 50% of all sales aids sold since May 2004 in an amount to be determined at trial and (ii) 4% of all memberships sold since May 2004, also in an amount to be determined at trial.

24.     Ms. Casperson has made demand for the foregoing but despite her demand, defendant has failed and refused to pay the amounts owed to her.

## COUNT I
### (Breach of Contract)

25.    Plaintiffs reallege and incorporate by reference, paragraphs 1-24 as if set forth in full herein.

26.    Ideal Health's actions in, among other things,  failing to compensate Plaintiffs as aforesaid constitutes a breach of the Acquisition Agreement.

27.    As a result of the foregoing  breach of the Acquisition Agreement, Plaintiffs have incurred damages in an amount to be determined at trial, but believed to be in excess of $200,000.00 plus prejudgment interest and costs.

## COUNT II
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

28.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-27 as if fully set forth in full herein.

29.    Every contract contains an implied covenant of good faith and fair dealing, under which each party promises not to injure the right of another party to realize its benefits under the contract.

30.    By engaging in the acts described above, Ideal Health breached the implied covenant of good faith and fair dealing in the Acquisition Agreement.

31.    As a result of the  breach of the implied covenant of good faith and fair dealing in the Agreement, Plaintiffs have incurred damages in an amount to be determined at trial, but believed to be in excess of $200,00.00 plus prejudgment interest and costs.

## COUNT III
### (Conversion)

32.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-31 as if set forth in full herein.

33.     Ideal Health has acted with the intent to deprive Plaintiffs of property, or to appropriate the same for its personal gain, has wrongfully retained, appropriated or used monies not rightfully belonging to it.

34.     Plaintiffs are the true owner of the monies wrongfully retained and withheld by Ideal health.

35.     Beginning in or around March 2006, Plaintiffs made demand for return of the monies as aforesaid.

36.     Thereafter, and despite due demand, Ideal Health converted the above-described funds to its own use.

37.     In converting the funds as aforesaid, Ideal Health acted maliciously, with wanton, willful and reckless disregard for Plaintiffs' property.

38.     As a result of such conversion, Plaintiffs have been damaged in an amount to be determined at trial, but believed to be in excess of $200,000.00 plus prejudgment interest and costs, plus punitive damages in the amount of $600,000.00.

## COUNT IV
### (Unjust Enrichment)

39     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-38 as if set forth in full herein.

40.     Ideal Health has received certain benefits, i.e., Plaintiffs' services and expertise along with the use of monies in excess of $200,000.00, to which it is not entitled. As such, Ideal Health has been unjustly enriched and equity and good conscience requires Ideal Health to pay Plaintiffs for the reasonable value of their services and goods so as to avoid Ideal Health from being unjustly enriched.

41.     Plaintiffs have been damaged by Ideal Health's unjust enrichment at Plaintiffs' expense in an amount to be determined at trial, but believed to be in excess of $200,000.00 plus prejudgment interest and costs.

**COUNT V**
**(Account Stated)**

42.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-21 as if set forth in full herein.

43.     Plaintiffs sent written statements to Ideal Health demanding payment for the expenses incurred.

44.     Ideal Health received and retained the written statements sent by Plaintiffs without protest.

45.     By virtue of the foregoing, Plaintiffs are entitled to a judgment against Ideal Health in the amount of $55,906.28 as an account stated, plus the costs and disbursements of this action and interest as provided by law.

WHEREFORE, plaintiffs request judgment as follows:

(1)     on Count I, a monetary award in the sum of $200,000.00 the precise amount to be proven at trial plus interest thereon; and

(2)    on Count II, a monetary award in the sum of $200,000.00 the precise amount to be proven at trial plus interest thereon;

(3)    on Count III, a monetary award in the sum of $200,000.00 the precise amount to be proven at trial, punitive damages in the amount of $600,000 plus interest thereon; and

(4)    On Count IV, a monetary award in the sum of $200,000.00 the precise amount to be proven at trial plus interest thereon; and

(5)    on Count V, a monetary award in the sum of $55,906.28 the precise amount to be proven at trial plus interest thereon; and

(6)    costs and disbursements; and

(7)    such other and further relief as may be just and equitable.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38, plaintiffs hereby demand a trial by jury.

Dated:  Westport, Connecticut
        August 7, 2007

                                   LAW OFFICES OF CAROLE R. BERNSTEIN

                                   By:_____
                                        Carole R. Bernstein (CB-8343)
                                   Attorneys for Bio Enterprises, Inc. and Kay Casperson

                                   41 Maple Avenue North
                                   Westport, Connecticut
                                   (203) 255-8698

-11-

# EXHIBIT A

# ACQUISITION AGREEMENT

This Acquisition Agreement and Exhibits A and B attached hereto and incorporated herein is made and entered into effective the 19th day of May, 2004 by and between Bio Enterprises Inc.  ("Transferor") and Ideal Health, Inc. ("Transferee").

In consideration of ten and no/100 Dollars (U.S. $10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Transferor and Transferee hereby agree as follows:

1.      Transferor does hereby sell, convey, transfer, assign, set over and deliver to Transferee all of its right, title and interest in and to the assets (collectively, the "Assets") identified on Exhibit "A" attached hereto and incorporated herein, as related to Transferor's Business.  As used herein, "Transferor's Business" shall mean all business operations and similar activity related to the development, manufacturing, production, promotion, sales and marketing of lotions for cosmetic purposes. ~~AS IT PERTAINS TO BIO ESSENTIALS~~ *Deleted by (TMS)* (RC) (tle)

2.      The transfer and assignment of the Bio Essentials  trademark includes all similar marks thereto, the goodwill associated therewith, and all rights for such mark's future use whether at common law or by statue and all registrations (including, but not limited to, all rights to the U.S. Registration No. 2673599 and U.S. Registration No.2721490 in the United States Trademark Office), it being the intent of the parties that such rights being transferred are all common law rights established by state and/ or federal or international statues and regulations.  Also, the transfer and assignment of any patents held by Transferor.

3.      The terms and conditions of this Acquisition Agreement including Exhibits A and B attached hereto and incorporated herein shall inure to the benefit of and be binding upon the respective heirs, legal representatives, successors and assigns of the parties hereto.

4.      This Acquisition Agreement is made pursuant to and shall be governed by and construed in accordance with the laws of the state of New York and applicable federal law.  The appropriate state or federal courts located in New York, New York, shall have exclusive jurisdiction over all matters arising under this Acquisition Agreement and shall be the proper forums in which to adjudicate such matters.

5.      In case of any one or more of the provisions of this Acquisition Agreement shall for any reason, be held to be invalid, illegal, or unenforceable in any effect, any other provision hereof and this instrument shall be construed as if such invalid, illegal, or unenforceable provision(s) has never been contained herein.  Such invalid, illegal, or unenforceable provision(s) shall be given effect to the maximum extent permitted by law.

6.      The terms and conditions of this Acquisition Agreement have been negotiated fully and freely between the parties hereto, all of whom have had the full and complete opportunity to be represented by independent legal counsel.  This Acquisition Agreement may not be modified or amended except by an instrument in writing executed by both Transferor and Transferee.

1

7.    Transferor does hereby bind itself and its successors and assigns to forever warrant and defend the title to the Assets unto Transferee, against all persons whosoever lawfully claiming, or to claim the same, or any part thereof.  Transferor does hereby represent and warrant to Transferee that the Assets are hereby transferred and assigned to Transferee free and clear of any and all claims, liens and encumbrances and that Transferor has all right and authority to enter into fulfill the terms of this Acquisition Agreement.

8.    Upon request of Transferee, Transferor agrees to execute such other reasonable documentation necessary or appropriate to confirm and record the terms of this Acquisition Agreement.

9.    This Acquisition Agreement may be executed in multiple counterparts and may be transmitted by facsimile, and it is the intent of the parties for the facsimile of any autograph printed by a receiving facsimile machine to be an original signature and for the facsimile and any complete photocopy of this letter to be deemed an original counterpart.

IN WITNESS WHEREOF, the undersigned parties hereto have executed this Acquisition Agreement effective the date first above written.

BIO ENTERPRISES INC.

By: _____

Print Name: _Kay Casperson_

IDEAL HEALTH, INC.

By: _____

Print Name: _Todd M. Stanwood_

2

**EXHIBIT A**
**Bio Enterprises Inc.'s Assets**

1. The trademark "Bio Essentials" including all similar marks thereto and the goodwill related thereto.

2. Any patents on cosmetic lotions.

3. All footage of events relating to Bio Essentials cosmetic lotions which have been filmed, and all aspects thereto, including without limitation (in whatever means stored) all pictures and images, sounds, scripts, themes, logos, production materials, and all licenses or leases of Transferor with respect thereto.

4. Any and all related intangible property rights of Transferor related to Transferor's Business.

3

## EXHIBIT B

*Inc.*

In consideration for the sale of Bio Essentials, Inc. ("Bio Essentials") to Ideal Health, LLC, ("IH") as described in the underlying Acquisition Agreement it is hereby agreed that Kay Casperson ("KC") shall be considered to be engaged by IH as an independent contractor.

As a result of this independent contractor relationship between KC and IH, KC will assume certain responsibilities and duties in the operation and management of Bio Essentials and furthermore shall receive various elements of compensation. Both the assumed responsibilities/duties as well as the compensation are enumerated as follows:

### Duties/Responsibilities:

**1. Product Development:**

KC shall consult and otherwise assist IH, with all product development under the Bio Essentials name, including but not limited to research and development and selection/design of packaging components.

**2. Manufacturing:**

KC and IH will mutually agree upon the selection of sources, manufacturers, materials, etc... to best design the most efficient, quality driven and cost effective system of manufacture of all current and future Bio Essentials products. IH shall be responsible for all costs related to manufacturing of said products.

**3. Packaging:**

KC will assist in the resourcing of all packaging for all Bio Essentials products. KC will have final approval of all proposed Bio Essentials package design. IH shall be responsible for all packaging costs.

**4. Advertising and Marketing:**

KC shall contribute to the marketing of all Bio Essentials products. KC shall also be responsible for the selection and hiring of any and all Public Relations or Marketing Agencies provided that KC and IH mutually agree upon the fees and other costs to be paid to any such or similar agencies. IH shall be responsible for all advertising and marketing costs.

**5. Production:**

IH shall be responsible for all costs of producing Bio and Bio Essentials personal care products.

4

**6. Sales:**

As the founder and spokesperson for Bio Essentials, KC will support the efforts of the company and the sales force in general by participating in promotions, training and other general support to the officers and management of IH, including traveling to attend various meetings, participating in conference calls and other promotional activities throughout the world.

**7. Fulfillment:**

IH will provide fulfillment and call center services via its current sources or any future sources as determined by IH. KC agrees to assist in the training of the fulfillment and call center staff and personnel for all current and future Bio Essentials products, as needed over time.

**8. Internet:**

KC and IH will work together to design and perfect the Bio Essentials website and internet presence and media as necessary to maintain effectiveness.

**9. Compensation:**

**A. Minimum Guarantee:**

1.  KC is guaranteed a minimum of $5,000 per month.

2.  If the sum of the monthly sales royalty, the monthly membership fee royalty and the monthly sales aids royalty, as defined below, amounts to less than $5,000 in any calendar month, IH shall pay KC an amount which when combined with the monthly sales royalty, the monthly membership fee royalty and the monthly sales aids royalty equals $5,000.

**B. Sales Royalty:**

KC shall receive a royalty equal to 2% of the total ~~wholesale~~/gross sales of all Bio and Bio Essentials personal care products (excluding Membership Packages and Sales Aids) less any sales, excise, use or any other taxes (not including income or franchise taxes) payable with respect to such sales, as well as returns, chargebacks, bad debt and any fees and/or costs related to returns, chargebacks, and any billing or other disputes.

**C. Membership Fee Royalty:**

KC shall receive a royalty of 4% of the Bio Essentials Membership Fees collected per month less any sales, excise, use or any other taxes (not including income or franchise taxes) payable with respect to such sales, as well as returns, chargebacks, bad debt and any fees and/or costs related to returns, chargebacks, and any billing or other disputes.

5

**D. Sales Aids Royalty:**

All Net Profits resulting from the sale of all Bio Essentials Sales Training Aids, including but not limited to, audio or video programs, DVD's, CD's, books, etc. shall be equally divided on a 50/50 basis per month between KC and UIX, L.L.C.

**E. Future Revenue:** *(KC)* *(TMS)*

Any future revenue generated from any new or additional sources, products or services etc. not yet developed and thereafter paid to KC in any percentage as may be determined at a later date, shall be also be added to the existing sources of revenue as delineated above to be applied against the Minimum Guarantee payment to be made to KC in any given month.

**F. Expenses**

IH shall pay for KC's reasonable business expenses hereunder including air, ground transportation, telephone, food and lodging if approved in writing in advance by IH.

**10. Term:**

The term of this Independent Contractor relationship between KC and IH shall continue until IH no longer markets any products or materials under the Bio Essentials name, at which time the independent contractor relationship shall dissolve without any further action by either party hereto.

**11. INVENTORY:**

IH WILL PURCHASE ALL EXISITING INVENTORY OF BIO ESSENTIALS WITHIN 30 DAYS FROM EFFECTIVE DATE AT THE COST PRICE. BIO ESSENTIALS PAID. *(KC) (TMS)*

**12. OTHER BUSINESS**

THIS CONTRACT SHALL BE FOR THE BUSINESS OF MARKETING OF BIO ESSENTIALS AND OTHER BIO (TMS) PERSONAL CARE PRODUCTS TO IH MARKETERS ONLY AND ALL OTHER BUSINESS OPPORTUNITIES SHALL BE A SEPERATE AGREEMENT IE. INFOMERCIAL, PUBLICATIONS, TALK SHOWS ETC.

*(KC) (TMS)*

6



Ideal Health
The Custom Health Company
www.IdealHealth.com

May 19, 2004

To: Kay Casperson, President
Fr: Todd Stanwood, President

Dear Kay,

As discussed, we will pay for your Family Insurance Policy as soon as we receive the exact dollar amount. This payment will be added to your minimum monthly payment. This policy will be in place no later than June 19, 2004 or sooner.

Sincerely,

Todd Stanwood, President
Ideal Health

100 Market Street ▪ Portsmouth, New Hampshire 03801 ▪ 603-334-3600 ▪ Facsimile 603-436-9637